**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 29, 2011

S T A T E  O F  M I C H I G A N

SUPREME COURT

TARA KATHERINE HAMED,

      Plaintiff-Appellee,

v                                                   No. 139505

WAYNE COUNTY and WAYNE
COUNTY SHERIFF'S DEPARTMENT,

      Defendants-Appellants,

and

SERGEANT KENNETH DARWISH,
CORPORAL NETTIE JACKSON,
SHERIFF WARREN C. EVANS, and
DEPUTY REGINALD JOHNSON,

      Defendants.

_____

BEFORE THE ENTIRE BENCH

MARY BETH KELLY, J.

      We granted leave to appeal in this case to determine the scope of an employer's

vicarious liability for quid pro quo sexual harassment affecting public services under

Michigan's Civil Rights Act (CRA).[1]  Specifically, we consider whether Wayne County and its sheriff's department may be held vicariously liable for a civil rights claim under MCL 37.2103(i) based on a criminal act of a deputy sheriff committed during working hours but plainly beyond the scope of his employment.  We hold that defendants may not be held vicariously liable for quid pro quo sexual harassment affecting public services under traditional principles of respondeat superior.  Accordingly, we reverse the Court of Appeals' judgment and reinstate the circuit court's order granting summary disposition in defendants' favor.

## I.  FACTS AND PROCEDURAL HISTORY

In August 2001, Livingston County deputy sheriffs arrested plaintiff, Tara Katherine Hamed, on a warrant for unpaid child support.  Because plaintiff also had outstanding warrants for probation violations in Wayne County, the Livingston County deputies later transferred plaintiff to the custody of Wayne County.  Wayne County deputies transported plaintiff to the Wayne County jail.  When plaintiff arrived at the jail, Deputy Reginald Johnson was the only officer on duty in the inmate registry area.[2]  While alone with plaintiff, Johnson subjected her to sexually charged comments and offers for better treatment in exchange for sexual favors.  Plaintiff resisted these advances, but Johnson transferred plaintiff into an area of the jail not subject to

[1] MCL 37.2101 *et seq.*

[2] Wayne County jail regulations require that a female officer be in attendance when female inmates are present.  The officers who transported plaintiff to the jail informed a supervisor that Johnson was the only deputy on duty.  The supervisor advised the officers to leave plaintiff with Johnson.

2

surveillance cameras and sexually assaulted her. Shortly thereafter, a female deputy transported plaintiff to another part of the jail. After her release, plaintiff reported the incident to departmental authorities. The Wayne County Sheriff's Department terminated Johnson's employment, and the state subsequently charged Johnson with criminal sexual conduct, of which he was ultimately convicted.[3]

In 2003, plaintiff filed a complaint against Johnson, Wayne County, the Wayne County Sheriff's Department, and the Wayne County Sheriff, among others, alleging various claims of gross negligence.[4] In 2006, plaintiff moved to amend her complaint, adding civil rights claims of quid pro quo and hostile-environment sexual harassment pursuant to MCL 37.2103(i). Defendants then moved for summary disposition under MCR 2.116(C)(8) and (10), arguing that, under the CRA, jails are excluded from liability and, because defendants had no notice of Johnson's sexually harassing conduct, they could not be vicariously liable for his actions.

The circuit court granted defendants summary disposition in two separate orders and dismissed all of plaintiff's civil rights claims. It concluded that plaintiff's hostile-environment claim failed because defendants had no prior notice that Johnson was a sexual predator. The circuit court also dismissed plaintiff's quid pro quo sexual

---

[3] See MCL 750.520c(k).

[4] The only remaining defendants are Wayne County and the Wayne County Sheriff's Department. Plaintiff received a default judgment against Johnson; Johnson, while a defendant in plaintiff's action, is not a party to this appeal. Thus, for the purposes of this opinion, our references to "defendants" encompass only the institutional defendants.

harassment claim on the basis that defendants are not vicariously liable for the criminal acts of sheriff's department employees.[5]

Plaintiff then appealed the circuit court's decision only with regard to her quid pro quo sexual harassment claim. The Court of Appeals reversed and applied this Court's analysis in *Champion v Nation Wide Security, Inc*[6] to hold that "[e]mployers are vicariously liable for acts of quid pro quo sexual harassment committed by their employees when those employees use their supervisory authority to perpetrate the harassment."[7] The Court of Appeals held that plaintiff had established a viable quid pro quo sexual harassment claim because "Johnson used his authority as a sheriff's deputy to exploit plaintiff's vulnerability . . . ."[8] We granted leave to consider whether defendants may be held vicariously liable for quid pro quo sexual harassment affecting public services under MCL 37.2103(i).[9]

## II. STANDARD OF REVIEW

We review de novo whether the Court of Appeals erred by reversing the circuit court's grant of summary disposition.[10] Whether defendants may be held vicariously liable for quid pro quo sexual harassment affecting a public service under the CRA is a

---

[5] See *Zsigo v Hurley Med Ctr*, 475 Mich 215; 716 NW2d 220 (2006).

[6] *Champion v Nation Wide Security, Inc*, 450 Mich 702; 545 NW2d 596 (1996).

[7] *Hamed v Wayne Co*, 284 Mich App 681, 693; 775 NW2d 1 (2009).

[8] *Id*.

[9] *Hamed v Wayne Co*, 486 Mich 996 (2010).

[10] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

4

question of law that we review de novo.[11] To the extent that defendants' arguments require us to interpret the meaning of the CRA, our review is also de novo.[12] When interpreting the meaning of a statute, we discern the Legislature's intent by examining the language used.[13] We read the statutory language in context and as a whole, considering the plain and ordinary meaning of every word.[14] If the language is clear and unambiguous, then we apply the statute as written without judicial construction.[15]

## III.  ANALYSIS

### A.  QUID PRO QUO SEXUAL HARASSMENT UNDER THE CRA

The CRA recognizes that freedom from discrimination because of sex is a civil right.[16] Accordingly, the act prohibits discrimination because of sex in employment, places of public accommodation, and public services.[17] MCL 37.2103(i) broadly defines "discrimination because of sex" as follows:

> Discrimination because of sex includes sexual harassment.  Sexual harassment means unwelcome sexual advances, requests for sexual favors,

---

[11] See *Veenstra v Washtenaw Country Club*, 466 Mich 155, 159; 645 NW2d 643 (2002).

[12] *Id.*

[13] *Danse Corp v Madison Hts*, 466 Mich 175, 181-182; 644 NW2d 721 (2002).

[14] *Herman v Berrien Co*, 481 Mich 352, 366; 750 NW2d 570 (2008).

[15] *Danse Corp*, 466 Mich at 182.

[16] MCL 37.2102(1).

[17] MCL 37.2202 (employment); MCL 37.2302 (public accommodations and public services).  For purposes of this opinion, we assume, without deciding, that the Wayne County jail is a "public service" as defined by MCL 37.2301(b).

5

and other verbal or physical conduct or communication of a sexual nature under the following conditions:

(*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly *to obtain* employment, public accommodations or *public services*, education, or housing.

(*ii*) Submission to or rejection of the conduct or communication by an individual *is used as a factor in decisions affecting the individual's* employment, public accommodations or *public services*, education, or housing.

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [Emphasis added.]

The first two subdivisions of MCL 37.2301(i) describe quid pro quo sexual harassment, while the third subdivision refers to hostile-environment sexual harassment.[18]

A plaintiff alleging quid pro quo sexual harassment affecting public services must show by a preponderance of the evidence (1) that he or she was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and (2) that the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services.[19]

---

[18] *Chambers v Trettco*, *Inc*, 463 Mich 297, 310; 614 NW2d 910 (2000).

[19] See *id.* (stating the test for quid pro quo sexual harassment in the employment context). For purposes of our analysis, we also assume, without deciding, that plaintiff can establish the elements of quid pro quo sexual harassment affecting public services.

When the harassment was committed by an agent and the plaintiff is pursuing a civil rights claim against the principal, as in this case, a court must always "determine the extent of the employer's vicarious liability . . . ."[20] We require this analysis because the CRA specifically incorporates common-law agency principles.[21] Thus, if a defendant is not vicariously liable for the acts of its agent under traditional principles of respondeat superior, the plaintiff's claim under the CRA fails as a matter of law.

## B. RESPONDEAT SUPERIOR

The doctrine of respondeat superior is well established in this state: An employer is generally liable for the torts its employees commit within the scope of their employment.[22] It follows that "an employer is not liable for the torts . . . committed by an employee when those torts are beyond the scope of the employer's business."[23] This Court has defined "within the scope of employment" to mean "'engaged in the service of his master, or while about his master's business.'"[24] Independent action, intended solely to further the employee's individual interests, cannot be fairly characterized as falling

---

[20] *Id*. at 311.

[21] *Id*. We reached this conclusion in *Chambers* because MCL 37.2201(a) "expressly defines 'employer' to include agents," thereby incorporating common-law agency principles into the act. *Chambers*, 463 Mich at 311.

[22] See, e.g., *Zsigo*, 475 Mich at 221; *Bradley v Stevens*, 329 Mich 556, 562; 46 NW2d 382 (1951); *Martin v Jones*, 302 Mich 355, 358; 4 NW2d 686 (1942); *Davidson v Chinese Republic Restaurant Co*, 201 Mich 389, 396; 167 NW 967 (1918).

[23] *Zsigo*, 475 Mich at 221.

[24] *Barnes v Mitchell*, 341 Mich 7, 13; 67 NW2d 208 (1954), quoting *Riley v Roach*, 168 Mich 294, 307; 134 NW 14 (1912).

7

within the scope of employment.[25] Although an act may be contrary to an employer's instructions, liability will nonetheless attach if the employee accomplished the act in furtherance, or the interest, of the employer's business.[26]

Here, there is no question that Johnson's sexual assault of plaintiff was beyond the scope of his employment as a deputy sheriff. The sexual assault was an independent action accomplished solely in furtherance of Johnson's own criminal interests. It cannot be said that any of the institutional defendants benefited in any way from Johnson's criminal assault or his exercise of unlawful authority over plaintiff. In fact, Johnson's behavior was expressly prohibited by defendants' rules regarding treatment of detainees and defendants' antidiscrimination policies, to say nothing of the criminal law. In short, there is no fair basis on which one could conclude that the sheriff or county themselves vicariously took part in the wrongful acts.

The general rule that an employer is not liable for acts of its employee outside the scope of its business, however, does not preclude vicarious liability in every instance. This Court has consistently recognized that an employer can be held liable for its employee's conduct if "the employer 'knew or should have known of [the] employee's *propensities and criminal record*'" before that employee committed an intentional tort.[27] This inquiry involves an analysis of whether an employer had (1) actual or constructive

---

[25] 2 Restatement Agency, 3d, § 7.07, p 201.

[26] See *Barnes*, 341 Mich at 13-16 (examining cases discussing scope of employment).

[27] *McClements v Ford Motor Co*, 473 Mich 373, 381; 702 NW2d 166 (2005), quoting *Hersh v Kentfield Builders, Inc*, 385 Mich 410, 412; 189 NW2d 286 (1971) (quotation marks omitted) (emphasis added).

knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance with that conduct. Under this two-pronged approach, the conduct at issue may be so close in time to prior similar conduct that knowledge under the first prong gives rise to a valid inference that the conduct was foreseeable under the second prong. Conversely, if an employee's actions were temporally distant and the employee's recent record suggested a change in character, foreseeability would not be established.[28]

We applied this principle in *Brown v Brown*, in which we held that the employer was not vicariously liable for a rape committed by its employee because, under the circumstances, the act was unforeseeable.[29] There, the defendant's employee repeatedly made sexually offensive comments to the plaintiff, a female coworker. The plaintiff reported the incidents to the defendant, yet it took no action, and the employee subsequently raped the plaintiff. In concluding that the employer was not vicariously liable, we noted that the employee had no prior criminal record and had never threatened to rape the plaintiff. We explained:

> [An employer] cannot reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an

---

[28] This analysis does not, as the dissenting justices assert, abandon prior caselaw to hold that "an employee's conduct is only foreseeable to an employer if the employee had recently committed the precise conduct at issue." *Post* at 22 n 20. This criticism mischaracterizes the inquiry that must be undertaken, which has its roots in well-established caselaw. See *McClements*, 473 Mich at 381; *Hersh*, 385 Mich at 412.

[29] *Brown v Brown*, 478 Mich 545, 554-555; 739 NW2d 313 (2007).

9

imminent risk of harm to a specific victim. Comments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault.[30]

In summary, we have consistently held that an employer's liability for the criminal acts of its employees is limited to those acts it can reasonably foresee or reasonably should have foreseen. This is because we should not expect employers to assume that their employees will disobey the law. Criminal conduct is inherently arbitrary and highly unpredictable. As we noted in *Brown*, even law enforcement agencies, which are trained in detecting and preventing crime, cannot predict the occurrence of criminal acts.[31] Contrary to plaintiff's argument, our caselaw governing the imposition of vicarious liability on an employer requires more than simply the exercise of some form of authority by an employee. Thus, it would be anomalous to adopt a rule requiring employers that provide public services to protect against the criminal actions of their employees absent some indicia of foreseeability. Rather, foreseeability is a necessary element for imposing liability, and, as we recently stated in *Brown*, we decline to "transform the test of

---

[30] *Id*. at 555. *Brown* did not, as the dissenting justices state, "conclude[] that an employee's prior violent criminal acts are generally sufficient to put a defendant on notice of the employee's propensity to commit similar violent acts . . . ." *Post* at 22-23. Rather, *Brown* made clear that knowledge of prior violent acts *potentially* provides an employer notice of an employee's violent propensities. *Brown*, 478 Mich at 561. The dissenting justices attempt to broaden the holding in *Brown* to justify their position that defendants' knowledge of Johnson's dissimilar prior violent act suffices to create a question of fact regarding foreseeability.

[31] *Id*. at 554, citing *MacDonald v PKT, Inc*, 464 Mich 322, 335; 628 NW2d 33 (2001).

foreseeability into an 'avoidability' test that would merely judge in hindsight whether the harm *could have been* avoided."[32]

Michigan's well-established rules governing respondeat superior are further justified by the societal burden that imposing liability for unforeseen criminal actions would create. Not only would holding employers vicariously liable for such acts be unfair, but doing so would attempt to further an impossible end by requiring employers to prevent harms they cannot anticipate, which are, in essence, unpreventable. The result would be the implementation of burdensome and impractical regulations meant to oversee employee conduct. Yet because such measures are sure to fail given that criminal conduct by its nature cannot be anticipated or foreseen, employers would essentially become insurers responsible for recompensing victims for the criminal acts of

---

[32] *Brown*, 478 Mich at 556. An "avoidability test" is the type of test the dissenting justices favor. In their view, defendants' policy prohibiting male deputies from being alone with female inmates demonstrates, in itself, that the sexual assault was preventable and foreseeable. However, reliance on the policy alone to impose liability obliterates any real foreseeability requirement; an employer's policy is irrelevant to assessing what the employer knows with respect to a specific employee. The consequence would be imposition of vicarious liability every time an employee disobeys the employer's policy, regardless of whether the act was unforeseeable under the actual circumstances.

Rather, as we have explained, a defendant's specific knowledge of past misconduct and propensity to act in conformity with such conduct must be the focus of a foreseeability analysis. This analysis, which the dissenting justices term a "newly imposed foreseeability analysis," *post* at 24, merely recognizes that foreseeability has always been the touchstone for when vicarious liability will be imposed. The criticism by the main dissent is not surprising, given that Justice CAVANAGH has previously expressed support for what effectively amounts to the imposition of strict liability in lieu of a foreseeability analysis. See *Brown*, 478 Mich at 570-580 (CAVANAGH, J., dissenting); *Anderson v Pine Knob Ski Resort, Inc*, 469 Mich 20, 30-35; 664 NW2d 756 (2003) (CAVANAGH, J., dissenting).

11

their employees. The harm of adopting such a policy would also extend to potential employees with less than impeccable personal backgrounds, who would encounter barriers to employment because employers, out of an abundance of caution, would be less willing to employ these individuals out of fear that *any* prior indiscretion could be used in a lawsuit to impute knowledge to the employer that it did not have.[33]

Applying the foreseeability analysis in this case dictates the conclusion that defendants are not legally responsible for Johnson's criminal acts. The majority of complaints against Johnson during his employment with defendants involved his failure to obey work-related policies, such as failure to report a change of home address, or unsatisfactory work performance, for example, temporarily leaving his work station while on duty. Some of the grievances filed against Johnson reflected more serious behavior, such as using a police vehicle without authorization to deliver baby formula to his home, allegedly making threatening calls to his landlord after receiving an eviction notice, and

---

[33] For a catalogue of some of the difficult questions that would confront an employer operating under the dissenting justices' rule, see *Brown*, 478 Mich at 566-570 (MARKMAN, J., concurring). "The rule proposed by the dissent, and the unanswered questions arising from that rule, would create confusion and uncertainty among employers throughout this state . . . ." *Id*. at 566. And employers would not be the only ones to suffer; employees would suffer as well because, were the dissenting justices' rule to become law, what rational employer would ever hire anybody with any history of problems in his or her background? "Why would any rational employer expose itself to the vagaries of litigation-by-hindsight . . . where it fails to predict unpredictable behavior if this could all be avoided by simply firing [or failing to hire] every odd or rude or quirky employee?" *Id.* at 569-570. The rule the dissenting justices propose would result in those with imperfect criminal histories, or even merely a history of arrests, becoming increasingly unemployable.

engaging in a physical altercation with a male inmate after an exchange of words.[34] Viewed in the light most favorable to plaintiff, this past misconduct put defendants on notice of Johnson's irresponsible and aggressive tendencies, which, at most, demonstrates that defendants were aware that Johnson had a propensity to disobey work-related protocol and engage in aggressive behavior when provoked. Defendants had no actual or constructive knowledge of prior similar criminal sexual misconduct. Even the incident of aggression did not put defendants on reasonable notice that Johnson would sexually assault an inmate; violent actions do not inevitably lead to acts of criminal sexual conduct.[35] Because Johnson's prior misconduct was not similar to the violent sexual assault he perpetrated against plaintiff, we hold that defendants may not be held vicariously liable for quid pro quo sexual harassment based on Johnson's unforeseeable criminal act under traditional principles of respondeat superior.[36]

---

[34] The dissenting justices misrepresent the seriousness of Johnson's past conduct, stating that he "had a specific history of violent and abusive behavior toward inmates." *Post* at 22. In fact, Johnson had engaged in a single physical altercation with a male inmate in 1988, 13 years before the sexual assault in this case. Unlike the circumstances here, Johnson did not initiate the altercation with the male inmate.

[35] Cf. *Brown*, 478 Mich at 555.

[36] The dissenting justices dismiss our foreseeability analysis, concluding that Johnson's past violent act and sexual assault of plaintiff more than a decade later is sufficient to create a question of fact concerning defendants' vicarious liability. According to the dissenting justices, defendants had notice that Johnson would sexually assault a female inmate because Johnson, 13 years earlier, had engaged in a physical altercation initiated by a male inmate. In their view, *any* past violent conduct may create a jury-submissible question regarding foreseeability. Moreover, their contention that the question of foreseeability should have been submitted to the jury because this matter is substantially similar to *Hersh* is unavailing. In that case, the defendant's employee had a criminal conviction for *similar* prior conduct 10 years earlier, which the employer knew about, thus establishing a factual question regarding whether the employee had "vicious

13

## C. *CHAMPION v NATION WIDE SECURITY, INC* AND ITS PROGENY

Plaintiff urges us to ignore these traditional common-law principles and extend the reasoning of this Court's decision in *Champion*, which referred to the Second Restatement of Agency's "aided-by-agency" exception to the rule of respondeat superior.[37] We reject this argument because, for reasons we will explain, *Champion* wrongly applied this respondeat superior exception to the CRA.

In *Champion*, this Court addressed, as a matter of first impression, whether an employer could be held vicariously liable for quid pro quo sexual harassment under the CRA. In that case, the plaintiff worked as a security guard, and her immediate supervisor scheduled her work, trained her, oversaw her performance, and was responsible for disciplining her. During a weekend shift, the supervisor, who had been making sexually suggestive comments to the plaintiff, led her to a remote area of the building, locked her in a room, and demanded sex. When the plaintiff refused, the supervisor forcibly raped her. The plaintiff sued her employer for quid pro quo sexual harassment under the CRA.

---

propensities." *Hersh*, 385 Mich at 413, 415. As we have indicated, evidence of *dissimilar* violent conduct is not reasonably predictive of violent sexual conduct. Nor can it be said that a reasonable employer could genuinely have foreseen Johnson's sexual assault of plaintiff on the basis of a single instance of entirely dissimilar violent conduct that arose as a result of provocation by a male inmate 13 years earlier. The dissenting justices fail to recognize that the temporal distance and the dissimilarity between past conduct and the conduct at issue make it unreasonable to conclude that an employer could have foreseen that Johnson would engage in quid pro quo sexual harassment or commit a criminal sexual assault.

[37] *Champion*, 450 Mich at 712 n 6.

The defendant argued that the supervisor was not acting as its agent when he raped the plaintiff because it had not authorized the rape.[38]

The *Champion* Court rejected the defendant's argument, reasoning that "under defendant's construction, an employer could avoid liability simply by showing that it did not authorize the sexually offensive conduct."[39] The Court indicated that the defendant's "construction of agency principles [was] far too narrow" and briefly cited in support the aided-by-agency exception articulated in § 219(2)(d) of the Second Restatement of Agency.[40] The Court further stated that

> [the defendant's view] fails to recognize that when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors' unlawful exercise of that authority. From his scheduling decisions that allowed him to work alone with [the plaintiff] to his ordering of her into a remote part of the building, [the supervisor] used his supervisory power to put [the plaintiff] in the vulnerable position that led to her rape. In fact, there is little doubt that [the supervisor] would have been unable to rape [the plaintiff] but for his exercise of supervisory authority.[41]

---

[38] *Id*. at 705-707.

[39] *Id*. at 713.

[40] *Id*. at 712 n 6. 1 Restatement Agency, 2d, § 219(2), p 481, provides that

> [a] master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> * * *
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[41] *Champion*, 450 Mich at 712 (citation omitted).

Citing multiple federal cases, the *Champion* Court held that "an employer [is] strictly liable where the supervisor accomplishes the rape through the exercise of his supervisory power over the victim."[42] The Court justified its holding on the basis that "employers rarely, if ever, authorize such conduct, [and consequently] employees would no longer have a remedy for quid pro quo sexual harassment."[43]

Four years later, this Court again considered a quid pro quo sexual harassment claim in *Chambers v Trettco, Inc*.[44] There, a supervisor subjected the plaintiff to sexually offensive conduct. After enduring this conduct for four days, the plaintiff reported the incidents to another supervisor and ultimately sued her employer for hostile-environment and quid pro quo sexual harassment. A jury returned a verdict in the plaintiff's favor, and the Court of Appeals affirmed. The Court of Appeals in *Chambers* referred to federal caselaw that applied the federal Civil Rights Act[45] to hold that employers are vicariously liable when a supervisor victimizes a subordinate by creating a hostile work environment.

This Court granted leave to consider whether principles derived from federal caselaw should apply to claims brought under Michigan's CRA. We held that courts considering claims under Michigan's CRA must adhere to Michigan precedent and the

---

[42] *Id.* at 713-714. Since our decision in *Champion*, the drafters of the Third Restatement of Agency have excluded the aided-by-agency exception included in the Second Restatement of Agency.

[43] *Id*. at 713.

[44] *Chambers*, 463 Mich 297.

[45] 42 USC 2000e *et seq*.

language of the CRA.[46] We clarified the law regarding sexual harassment in employment under the Michigan CRA and recognized that the "statute expressly addresses an employer's vicarious liability for sexual harassment committed by its employees by defining 'employer' to include both the employer *and* the employer's agents."[47] Using this definition, we determined that the Michigan CRA specifically incorporates common-law principles of respondeat superior and that "whether analyzing quid pro quo harassment or hostile environment harassment, the question is always whether it can be fairly said that the employer committed the violation—either directly or through an agent."[48]

After our decisions in *Champion* and *Chambers*, this Court considered the doctrine of respondeat superior generally in *Zsigo v Hurley Med Ctr*.[49] Although *Zsigo* did not involve a civil rights claim, the plaintiff sought to hold the defendant-employer vicariously liable for various intentional tort claims using the reasoning in *Champion* and the aided-by-agency exception to the doctrine of respondeat superior. The underlying facts involved a sexual assault perpetrated by the defendant's employee against the plaintiff, who had been admitted as a patient in the defendant hospital. The plaintiff

---

[46] *Chambers*, 463 Mich at 316.

[47] *Id.* at 310.

[48] *Id*. at 312.

[49] *Zsigo*, 475 Mich 215. This Court did consider a single intervening civil rights case concerning quid pro quo sexual harassment, but the resolution of that case did not require application of the doctrine of respondeat superior because the plaintiff failed to establish that sexual harassment had occurred. See *Corley v Detroit Bd of Ed*, 470 Mich 274; 681 NW2d 342 (2004).

17

reported the incident and subsequently sued the hospital on the basis of the employee's actions.

We rejected the plaintiff's theory of vicarious liability and any notion that Michigan common law recognized the aided-by-agency exception or that this Court had adopted it in *Champion*.[50] With regard to *Champion*'s reference to the aided-by-agency exception, we explained that *Champion* did not adopt the aided-by-agency exception, but referred to it "only in passing and on the basis of the very distinct facts of that civil rights matter."[51] We further explained that *Champion* applied only in the context of quid pro quo sexual harassment under MCL 37.2103(i) and, in such instances, "the sexual assault must be 'accomplished through the use of the supervisor's managerial powers.'"[52] We ultimately rejected the plaintiff's theory of liability because it would have subjected employers to strict liability for unforeseen acts occurring outside the scope of an employee's employment.[53] Accordingly, the *Zsigo* Court declined to adopt the aided-by-agency exception and limited its applicability to the specific facts of the civil rights claim in *Champion*.

---

[50] *Zsigo*, 475 Mich at 221-224.

[51] *Id.* at 223-224.

[52] *Id.* at 224 n 19, quoting *Champion*, 450 Mich at 704.

[53] *Zsigo*, 475 Mich at 227.

18

## D. *CHAMPION* WAS WRONGLY DECIDED

Because *Zsigo* involved intentional tort claims, it did not provide an opportunity to address the validity of *Champion* in the civil rights context.[54] *Zsigo* required us to consider whether Michigan common law recognized the aided-by-agency exception, given the intentional tort claims at issue. The present matter now places *Champion*'s continued validity squarely before us, and we conclude that *Champion* cannot be reconciled with *Chambers*, *Zsigo*, or the CRA itself.

First, we note that *Champion*'s holding was contrary to the plain language of the CRA. As we explained in *Chambers*, the CRA specifically incorporates common-law agency principles in its definition of "employer."[55] Michigan's common-law agency principles, however, do not include the aided-by-agency exception,[56] and the Legislature did not modify the common law by including the aided-by-agency exception in the CRA.[57] The *Champion* Court failed to recognize this clear intent. Rather, like the dissenting justices here, the *Champion* Court reasoned that the remedial purpose of the

---

[54] Although Justice YOUNG recognized that the exception to respondeat superior that *Champion* created was "hard to square . . . with any conventional notion of agency, and . . . stands as an isolated, inexplicable exception" to this Court's agency jurisprudence, the Court was constrained to merely limit the application of *Champion* given that no civil rights claim was at issue in *Zsigo*. *Id*. at 232 (YOUNG, J., concurring).

[55] See *Chambers*, 463 Mich at 310-311.

[56] See *Zsigo*, 475 Mich at 223-224.

[57] The common law remains in force until it is affirmatively modified. Const 1963, art 3, § 7. The Legislature is presumed to know the common law, and any abrogation of the common law must be explicit. *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 28; 780 NW2d 272 (2010).

19

civil rights law justified holding the defendant employer vicariously liable for the acts of its employee, based on an apprehension that adherence to traditional agency principles would completely foreclose employer liability for quid pro quo sexual harassment claims.[58]

Aside from failing to give effect to the Legislature's intent, this reasoning is flawed for two additional reasons. First, it wrongly elevates the CRA's general remedial purpose above its plain language. Such reasoning is contrary to the cornerstone of statutory interpretation, which is the rule that the plain language used is the best indicator of the Legislature's intent.[59] Second, the policy concern at the heart of *Champion* is fundamentally flawed because it was premised on an unfounded fear. Application of traditional agency principles does *not* foreclose employers from vicarious liability in the context of quid pro quo sexual harassment claims. An employer may still be liable for and act of quid pro quo sexual harassment that was committed within the scope of employment or for a foreseeable act that was committed outside the scope of

---

[58] *Champion*, 450 Mich at 713. While the dissenting justices are correct that the purpose of a statute may be a relevant consideration, *post* at 3 n 3, what they fail to recognize is that this is correct *only* in so far as the purpose of the statute is derived from the actual language of the statute. See *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 202-203; ___ NW2d ___ (2011) ("The clear purpose of [the statute], *as reflected in its language*, is to mandate the separation of the government from politics in order to maintain governmental neutrality in elections, preserve fair democratic processes, and prevent taxpayer funds from being used to subsidize partisan political activities.") (emphasis added).

[59] See *Danse Corp*, 466 Mich at 181-182.

employment.[60] Thus, liability may certainly attach if there is sufficient cause to impute the employee's or agent's acts to the employer because the employer knew of the employee's propensity to commit the type of act involved.

The *Champion* Court compounded its erroneous holding by relying on federal caselaw.[61] Unlike the federal civil rights act, the Michigan CRA specifically incorporates Michigan common-law agency principles. Hence, unlike federal courts applying the federal civil rights act, Michigan courts applying the Michigan CRA are bound by this state's common-law agency principles. Because federal courts are not so bound, their reasoning in this context is often inapposite given that the language of the CRA must guide our decisions. For this reason, the Michigan Legislature's choice to incorporate agency principles into the CRA forecloses reliance on federal cases when determining whether a defendant will be vicariously liable under the CRA.[62]

Finally, we note that *Champion* is contrary to both prior and subsequent caselaw. Before *Champion*, this Court had never held that an employer could be vicariously liable for the unforeseeable criminal acts of its employees. Subsequent caselaw attempted to limit *Champion*'s applicability, but that caselaw merely demonstrated *Champion*'s

[60] Application of traditional respondeat superior principles also does not foreclose other avenues of legal recourse, including pursuit of direct criminal and civil liability against the perpetrator.

[61] See *Champion*, 450 Mich at 712 n 8, citing *Karibian v Columbia Univ*, 14 F3d 773 (CA 2, 1994), *Kauffman v Allied Signal, Inc*, 970 F2d 178 (CA 6, 1992), *Horn v Duke Homes*, 755 F2d 599 (CA 7, 1985), *Craig v Y & Y Snacks, Inc*, 721 F2d 77 (CA 3, 1983), *Katz v Dole*, 709 F2d 251 (CA 4, 1983), *Henson v City of Dundee*, 682 F2d 897 (CA 11, 1982), and *Miller v Bank of America*, 600 F2d 211 (CA 9, 1979).

[62] *Chambers*, 463 Mich at 315-316.

21

dubious validity. *Chambers* recognized that the CRA incorporates common-law agency principles, and *Zsigo* made it clear that the aided-by-agency exception is not a part of this state's common law. Thus, contrary to the mandates of *Chambers* and *Zsigo*, *Champion* requires the application of an exception to respondeat superior in the context of quid pro quo sexual harassment claims that is not a part of this state's common law.[63] Because *Champion* requires a result contrary to prior and subsequent caselaw and contrary to the language of the CRA, it is clear that *Champion* is not consistent with Michigan law. Rather, when considered in the context of our jurisprudence, *Champion* stands as an isolated aberration that relies not on the plain language of the act, but purely on policy considerations.

## E.  STARE DECISIS

Our inquiry does not end simply because we have concluded that *Champion* was wrongly decided. Rather, we must determine whether overruling *Champion* is the most appropriate course of action. This is a decision that we do not undertake lightly and will make "only . . . after careful consideration of the effect of stare decisis."[64] However, we

---

[63] Significantly, the drafters of the Third Restatement of Agency chose to exclude the aided-by-agency exception, thereby implicitly recognizing that the exception is not consistent with generally accepted common-law agency principles. While the dissenting justices dismiss this authority as unpersuasive, they ignore the fact that the aided-by-agency exception is not a "widely accepted exception to the general rules of agency." *Post* at 9. Only a few jurisdictions have adopted the exception wholesale into their common law, such that it applies to a typical tort claim. And, as we have explained, Michigan explicitly rejected the exception in *Zsigo* because it is inconsistent with fundamental principles of Michigan common law.

[64] *Haynie v Dep't of State Police*, 468 Mich 302, 314; 664 NW2d 129 (2003).

are also mindful that we are under no obligation to let stand an erroneous decision in the interest of stability and continuity.[65] We consider a multifactored test when determining whether to overrule precedent. The first question is whether the decision at issue was wrongly decided.[66] Having already addressed this question, we must now consider whether *Champion* "defies 'practical workability'" and "whether reliance interests would work an undue hardship . . . ."[67] These factors weigh in favor of overruling *Champion*.

First, despite our attempt in *Zsigo* to limit *Champion* to claims involving quid pro quo sexual harassment affecting employment, the present matter demonstrates that it is not possible to limit *Champion* in this respect. No meaningful distinction can be drawn between the facts in *Champion* and those in the present matter. Both Johnson and the supervisor in *Champion* were able to commit the rapes through their positions of authority over their victims. In both cases, the employers' agents had discretionary control over their victims by virtue of their positions: the supervisor in *Champion* was able to dictate the victim's schedule and order her to certain parts of the building, and Johnson had the authority to constrain plaintiff's freedom and to move her to certain parts of the jail. Certainly factual distinctions exist between *Champion* and the present case. Johnson was not plaintiff's supervisor in an employment context, and he could not have made plaintiff come to the building where he worked, unlike the supervisor in *Champion*. Yet these dissimilarities do not detract from the fact that Johnson would not have been

---

[65] *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000).

[66] *Id.*

[67] *Id*.

able to commit the sexual assault but for his position of authority over plaintiff, much like the supervisor in *Champion*.

Indeed, *Champion*'s distortive impact, which is manifested when a plaintiff attempts to circumvent traditional rules of respondeat superior or otherwise attempts to avoid governmental immunity by framing a claim under the CRA, is apparent in lower court decisions of this state and further demonstrates *Champion*'s unworkability.[68] This is because there is no way to effectively limit the rule announced in *Champion*, despite our prior attempt to do so. The reasoning on which *Champion* justified its holding is applicable not only to every quid pro quo sexual harassment case in which a plaintiff pursues a theory of vicarious liability—regardless of whether the discriminatory conduct affected employment, public services, or accommodations—but also to intentional tort claims in which a plaintiff seeks to hold an employer vicariously liable. Under *Champion*, it will always be "foreseeable" that employees who possess some authority by virtue of the employment relationship will abuse the power with which they have been vested when they commit, as here, a criminal act against another in the workplace.

---

[68] The Court of Appeals decision in this case is one example, see *Hamed*, 284 Mich App 681, as is the plaintiff's attempt in *Zsigo* to hold the employer vicariously liable for its employee's unforeseeable criminal act. See also *Diamond v Witherspoon*, 265 Mich App 673, 690-691; 696 NW2d 770 (2005) (presuming strict vicarious liability and rejecting governmental immunity in the context of a quid pro quo sexual harassment case under the CRA when a police officer subjected detained individuals to sexual conduct), and *Salinas v Genesys Health Sys*, 263 Mich App 315; 688 NW2d 112 (2004) (rejecting the plaintiff's attempt to hold the employer vicariously liable in tort for an unforeseeable criminal act under *Champion*).

Second, with regard to reliance interests, we cannot conclude that *Champion* "has become so embedded, so accepted, so fundamental, to everyone's expectations" that overruling it would upset any real-world reliance interests.[69] For there to be reliance, knowledge of a decision "must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event."[70] There is no indication that plaintiff or defendants relied on *Champion* by conforming their conduct before the underlying event—and, given the nature of the rule in *Champion*, it is unclear what form such reliance could have taken. It would be illogical to conclude that defendants condoned the sexual assault because of *Champion*, given that *Champion* would have imposed vicarious liability for the unforeseeable criminal acts of defendants' agent. Nor would it be reasonable to suggest that plaintiff altered her conduct in reliance on *Champion*. We simply fail to see any possible way defendants and plaintiff could assert reliance on *Champion*.

Further, when the decision at issue involves statutory law, the best indicator of society's knowledge of the law, and what society reasonably relies on, is the language of the statute itself.[71] As we have explained, nothing in the language of the CRA eviscerates common-law rules of respondeat superior or otherwise engrafts the aided-by-agency

---

[69] *Robinson*, 462 Mich at 466.

[70] *Id*. at 467.

[71] See *id*. (stating that "it is well to recall in discussing reliance, when dealing with an area of the law that is statutory . . . , that it is to the words of the statute itself that a citizen first looks for guidance in directing his actions").

exception into the statute.  Accordingly, a decision to overrule *Champion* would not create any real-world dislocations.

Finally, further justification for overruling *Champion* can be found in the adverse practical consequences that would result from extending the case to the present matter. As we explained in *Zsigo*, "it is difficult to conceive of an instance when the [aided-by-agency] exception would not apply because an employee, by virtue of his or her employment relationship with the employer[,] is always 'aided in accomplishing' the tort."[72]  Such an all-encompassing exception would apply equally to public-service cases.[73]  Consequently, adoption of the aided-by-agency exception would effectively abolish the doctrine of respondeat superior in quid pro quo civil rights cases affecting public services and would result in the imposition of strict liability on governmental entities.  In short, the exception would swallow the rule.  Contrary to the current requirements for imposing vicarious liability, if the exception were adopted, a plaintiff would merely have to allege quid pro quo harassment and show that he or she was the victim of an intentional act by an employee in a particular custodial environment. Providers of public services would be liable for the unforeseeable criminal acts of their

---

[72] *Zsigo*, 475 Mich at 226.

[73] In *Zsigo*, this Court noted that to adopt a rule contrary to that of the traditional common law would mean that the rule "applies to a broad range of employees whose duties *grant them unique access to and authority over others, such as . . . correctional officers,*" which "could virtually 'eviscerate[] the general scope of employment rule.'"  *Zsigo*, 475 Mich at 230, quoting *Doe v Forrest*, 2004 VT 37, ¶ 59; 176 Vt 476, 505; 853 A2d 48 (2004) (Skoglund, J., dissenting) (quotation marks omitted; emphasis added; alteration in original).

employees as long as claimants could couch their claims under the CRA, and the dangers of such a broad basis for seemingly unlimited strict liability, discussed earlier in this opinion, would become realities. Such a standard would apply to a wide range of public-service providers whose employees interact regularly with recipients of public services, including teachers, correctional and probation officers, physicians, nurses, and firefighters, to name a few.[74] Because public entities cannot increase prices or otherwise alter business practices to absorb the increased risk of liability, a governmental agency's only option may be to cut funding or curtail beneficial public programs. In justifying our decision to overrule *Champion* on this basis, we do not downplay the heinous nature of the crime that plaintiff suffered. However, permitting liability against defendants under these circumstances would impose too great a burden on public-service providers and on society in general, which is clearly contrary to the Legislature's intent.[75]

We therefore conclude that *Champion* was wrongly decided and that overruling it would not interfere with legitimate reliance interests. We overrule *Champion* because it is inconsistent with longstanding Michigan law that employers, including public-service

---

[74] Artful pleading would also allow a plaintiff to avoid governmental immunity under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.* A school district, for example, could not be vicariously liable in tort for a teacher's sexual molestation of a student because the GTLA would bar the claim. However, if the plaintiff styled its claim as a CRA action, the school district could be vicariously liable under a theory of quid pro quo sexual harassment affecting public services. Plaintiff's preferred approach, under which public-service providers would be strictly liable for *precisely the same conduct* as that for which they would typically be immune, is inherently inconsistent with the Legislature's intent. If the Legislature had intended such a result, it should have clearly abrogated the common-law rule for purposes of the CRA.

[75] See *Brown*, 478 Mich at 557-558, and the discussion at page 11 of this opinion.

providers, are not vicariously liable for quid pro quo sexual harassment on the basis of the unforeseeable criminal acts of their employees.[76]

## F. RESPONSE TO THE DISSENTS

We disagree with the dissenting justices regarding whether *Champion* was correctly decided and should be overruled. Although the dissenting justices concede that *Champion* was unprecedented, they adhere to *Champion*'s reasoning to conclude that the exception to common-law agency principles is necessary to give effect to the broad purpose of the CRA and the Legislature's intent in enacting it. Yet the dissenting justices' conclusion that *Champion* was correctly decided for this reason ignores the fundamental flaws inherent in *Champion*. Notably, the dissenting opinions, like *Champion*, do not cite any language from the CRA to support this view, even though a statute's language is the best indicator of the Legislature's intent. Instead, the dissenting justices rely on caselaw describing the CRA as "remedial," just as *Champion* did, for the proposition that "the exception to common-law agency principles established in *Champion* is necessary to give effect to the broad purpose of the CRA . . . ."[77]

---

[76] Because we have decided that defendants cannot be held vicariously liable for Johnson's criminal act under the CRA, we need not address defendants' alternative arguments that the Wayne County jail is not a "public service" within the meaning of the CRA or that the circuit court improperly permitted plaintiff to amend the complaint.

[77] *Post* at 3 (CAVANAGH, J., dissenting). Likewise, the author of the other dissent cites no specific language and provides no analysis in support of her accusation that our decision is somehow "contrary to the rule of law" or "results in the dismantling of the [CRA]." *Post* at 2 (HATHAWAY, J., dissenting). Rather, as we have explained at great length, our decision honors both our common-law tradition and the language of the CRA and is consistent with that statute's purpose.

28

Apparently, this "necessity" is based on the dissenting justices' concern, as was the concern in *Champion*, that without the exception, discriminatory conduct would not be eradicated and the purpose of the CRA would be defeated.[78] This fear vastly overstates the effect of our decision because, as we have explained, employers and public-service providers will still be vicariously liable for sexual harassment under traditional and longstanding principles of respondeat superior. In short, the dissenting justices' reliance on *Champion* itself for the proposition that *Champion* was correctly decided lacks merit for reasons we have already explained.[79]

The dissenting justices compound their erroneous reasoning by wrongly interpreting subsequent opinions of this Court as confirming that *Champion* was correctly decided and as explicitly confirming that *Champion* adopted an exception "very similar to the aided-by-agency exception."[80] Contrary to the dissenting justices' view, *Zsigo* did *not* expressly confirm *Champion* in this regard, and *Chambers* did *not* expressly hold that *Champion* is a valid part of Michigan's common law, both of which the dissenting

---

[78] The dissenting justices' concern in this regard is related to their failure to recognize plaintiff's claim for what it really is: an attempt to hold a governmental entity liable for an employee's criminal action and unforeseeable intentional tort.

[79] Indeed, the dissenting justices concede that the "bulk of [their] analysis" relies only on *Champion*, *post* at 8 n 7, which we have explained at length is a decision not supported in Michigan's law generally, and thereby effectively admit that no other binding Michigan law supports their conclusion other than *Champion*. Simply because *Champion* was a unanimous decision decided 15 years ago does not mean it was correctly decided or that its reasoning is correct today. Not only do the dissenting justices ignore the plain language of the CRA, they also ignore subsequent changes in the law that have exposed the flaws in *Champion*'s reasoning. See pages 21-22 and note 63 of this opinion.

[80] *Post* at 6.

29

justices suggest.[81]  Further, although the dissenting justices acknowledge that the CRA incorporates common-law agency principles, they then ignore the explicit and unambiguous holding in *Zsigo*, namely that this Court has never recognized the aided-by-agency exception, or a similar rule, as part of this state's common law.  Despite *Zsigo*'s unambiguous holding, the dissenting justices continue to declare that *Champion* should be applied in sexual discrimination cases because the exception can be "narrowly tailored."[82]  The *Zsigo* majority rejected any notion that the exception had such boundaries, which demonstrates that *Zsigo* does not support *Champion* in this regard. Thus, it is the dissenting justices who seek to aggressively expand the law of this state, while our holding merely reaffirms and applies traditional common-law rules that have always governed in Michigan.

Not surprisingly, using the faulty premise that *Champion*'s reasoning is correct, the dissenting justices advocate a straightforward application of *Champion*.  This approach ignores an irreconcilable tension in our law.  Although *Champion* and this case are similarly framed civil rights cases involving allegations of quid pro quo sexual

---

[81] In fact, contrary to the dissenting justices' position, *Zsigo* did undermine the primary rationale of *Champion*.  The *Zsigo* Court did not entirely "dispatch the exception created in *Champion*," *post* at 7 n 6, because *Zsigo* was not a civil rights case.

[82] *Post* at 8.  The dissenting justices' position that *Champion* was correctly decided on this basis relies primarily on the dissenting opinion in *Zsigo*, which is not binding precedent.  The dissenting justices in this case disregard this criticism, asserting that the dissenting opinion in *Zsigo* is an "example" of *Champion*'s workability.  *Post* at 8 n 7. Yet, the rationale of the dissent in *Zsigo* lacks any persuasive value because, like the main dissent here, the *Zsigo* dissent repeatedly advocated adopting the aided-by-agency exception and the Vermont Supreme Court's decision in *Doe*.  This Court has already explicitly rejected both as inconsistent with Michigan law.

harassment, the conflicting dispositions in the courts below demonstrate the tension between the multiple precedents of this Court at issue in this case. The circuit court below relied on *Zsigo* to grant summary disposition to defendants, recognizing that *Zsigo* established "a very clear bright line rule" that an employer is not liable when an employee unforeseeably acts outside the scope of his employment, as was the case here. The Court of Appeals reversed, relying instead on *Champion*, which had never been applied outside the employment context, for the proposition that a public-service provider may be vicariously liable when its employee uses his or her "authority over a subordinate as a means of subjecting that subordinate to abusive and unlawful conduct." Thus, in this case, we are presented with conflicting principles: those of the traditional common-law rule that have guided Michigan law for more than a century as articulated in *Zsigo* and those underlying the rule of *Champion*, which inexplicably departed from the requirements that have always been held as necessary to impose respondeat superior liability. The existence of these conflicting precedents and principles cries out for clarity and compels our decision to overrule *Champion*.

Further, we disagree with the main dissent's view that principles of stare decisis do not support overruling *Champion*. The main dissent applies a stare decisis test set forth in *Petersen v Magna Corp*[83] that is not the law of this state. Because a majority of this Court did not adopt that test, and a majority of justices have agreed to the rule

---

[83] *Petersen v Magna Corp*, 484 Mich 300, 313-320; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.).

31

articulated in *Robinson v Detroit*,[84] the test in *Robinson* governs this analysis. Nevertheless, overruling *Champion* is the right result, regardless of which test is applied.

The most basic error in the main dissent's stare decisis analysis is its misunderstanding of why *Champion* is unworkable. The dissent posits that the aided-by-agency exception is "narrowly tailored" because it applies only when an agency relationship aided a supervisor in committing a wrongful act.[85] According to the dissent, the exception does not apply when an agency relationship merely provided a supervisor an opportunity to accomplish a wrong. This interpretation is nothing more than a semantic exercise that demonstrates the capricious nature of *Champion*: An employment relationship will always provide a supervisory employee an opportunity to commit a wrong, but when does that opportunity become an "aid"? Similarly, in the public-services context, a citizen's interaction with an employee administering public services will always arise during the administration of those services while the employee is exercising his or her authority; when are public-service employees "aided" and when are they not "aided" while exercising their authority? There is no meaningful demarcation.[86] Continued adherence to *Champion* would require jurors and judges to determine vicarious liability according to their subjective whims. For this same reason, the

---

[84] *Robinson*, 462 Mich 439.

[85] *Post* at 8-9 (CAVANAGH, J., dissenting).

[86] The main dissent counters that application of the Vermont Supreme Court's three-pronged test would amount to "a narrowly tailored approach to applying the aided-by-agency exception . . . ." *Post* at 13. Yet this test suffers from the same deficiencies we have already described because it makes no valid distinction between a mere "opportunity" and an "aid."

dissent's view that *Champion* provides "important guidance to trial courts" is simply wrong.[87]

Finally, we find unpersuasive the main dissent's reliance on decisions from other jurisdictions that have applied the aided-by-agency exception in the context of their civil rights laws. If liability is to be imposed under Michigan law on an employer for sexual harassment committed by its employee, that liability must be mandated by the Michigan CRA.[88] The aided-by-agency exception in the context of civil rights cases is not so well accepted and "nearly unanimous" as the main dissent appears to claim.[89] Most states have *not* recognized the aided-by-agency exception in civil rights cases and, at least with respect to the jurisprudence of this Court, application of the aided-by-agency exception remains an aberration.

## IV. CONCLUSION

Michigan law has never imposed liability on an employer for the unforeseeable criminal actions of its employees, except in *Champion*. Nor has Michigan common law incorporated an exception based on an aided-by-agency theory of liability. Accordingly,

---

[87] *Post* at 14. The main dissent also misconstrues our citation of *Diamond* and *Salinas*. Those cases do not demonstrate *Champion*'s workability. Rather, they are examples of "artful pleading" in which the plaintiffs sought to circumvent traditional rules of respondeat superior by framing their claims under the CRA. See note 74 of this opinion.

[88] Notably, the main dissent ignores the mandate of *Chambers* to consider the language of the Michigan CRA of paramount importance when interpreting the Michigan CRA as opposed to any guidance that federal caselaw may provide. *Chambers*, 463 Mich at 313-314.

[89] *Post* at 15.

we conclude that a provider of a public service may not be held vicariously liable for quid pro quo sexual harassment affecting public services on the basis of unforeseeable criminal acts that its employee committed outside the scope of employment. Because *Champion* is inconsistent with our holding and with Michigan's common and statutory law, we overrule *Champion*. We reverse the Court of Appeals' judgment and reinstate the circuit court's order granting summary disposition in favor of defendants.

Mary Beth Kelly
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

TARA KATHERINE HAMED,

      Plaintiff-Appellee,

v

No. 139505

WAYNE COUNTY and WAYNE
COUNTY SHERIFF'S DEPARTMENT,

      Defendants-Appellants,
and

SERGEANT KENNETH DARWISH,
CORPORAL NETTIE JACKSON,
SHERIFF WARREN C. EVANS, and
DEPUTY REGINALD JOHNSON,

      Defendants.

_____

CAVANAGH, J. (*dissenting*).

I dissent from the majority's decision to overrule *Champion v Nation Wide Security, Inc*, 450 Mich 702; 545 NW2d 596 (1996), a unanimous decision of this Court.[1]

As the majority flatly admits, there are no significant factual differences between this case and *Champion*. Accordingly, because *Champion* was correctly decided and reflects the purpose and legislative intent of the Michigan Civil Rights Act (CRA), MCL 37.2101

---

[1] The concurring justices joined the analysis in full. See *Champion*, 450 Mich at 714 (BOYLE, J., concurring).

*et seq.*, I would apply *Champion* to this case and affirm the judgment of the Court of Appeals.

## I.  SUMMARY OF *CHAMPION*

In *Champion*, the plaintiff's supervisor offered job security in exchange for sexual favors, and when the plaintiff refused, the supervisor used his authority to isolate the plaintiff in a remote portion of the building where they worked and raped her.[2]  This Court explained that under MCL 37.2103(i), a party pursuing a quid pro quo harassment claim in an employment context must establish "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment."  *Champion*, 450 Mich at 708-709.  Like defendants in this case, the defendant in *Champion* argued that the plaintiff could not satisfy the second prong of a quid pro quo sexual harassment claim because the attacker was acting outside the scope of his authority when he raped the plaintiff and, as a result, was not acting as the defendant's agent.  This Court unanimously rejected that argument, stating that "when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors' unlawful exercise of that authority."  *Id*. at 712.  We

---

[2] Although many opinions address this issue in the context of workplace supervisor-subordinate relationships, those opinions are applicable to this case because the analysis is largely rooted in the recognition that a supervisor wields substantial authority over a subordinate, just as a sheriff's deputy, acting under color of law, holds significant authority over a jail inmate.

further noted that "an employer rarely authorizes an agent to break the law or otherwise behave improperly; yet, liability is frequently imputed to an employer for such conduct." *Id*. at 712 n 7.

In concluding that the plaintiff could pursue a quid pro quo sexual harassment claim against the defendant, *Champion* explained that a contrary result would "create an enormous loophole in the statute" that "would defeat the remedial purpose underlying this state's civil rights statute and would lead to a construction that is inconsistent with the well-established rule that remedial statutes are to be liberally construed." *Id.* at 713, citing *Eide v Kelsey-Hayes Co*, 431 Mich 26, 34; 427 NW2d 488 (1988).

## II. *CHAMPION* WAS CORRECTLY DECIDED

The majority claims that *Champion* "was contrary to the plain language of the CRA," *ante* at 19, and, thus, was wrongly decided. Although I generally agree with the majority that the CRA incorporated the common law of agency, the exception to common-law agency principles established in *Champion* was necessary to give effect to the broad purpose of the CRA and the Legislature's intent in enacting it. See *Henson v City of Dundee*, 682 F2d 897, 910 n 21 (CA 11, 1982) (recognizing that "[t]he common law rules of respondeat superior will not always be appropriate to suit the broad remedial purposes" of civil rights statutes).[3] Furthermore, this Court has previously considered the

---

[3] This Court has recognized that the purpose of a statute is a relevant consideration when applying the statute in a broad array of cases. See, e.g., *Adair v Michigan*, 486 Mich 468, 477; 785 NW2d 119 (2010) (stating that "the primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the *purpose and intent* as expressed in the constitutional or legislative provision in question")

3

purpose of the CRA as a method of discerning the legislative intent behind the act. See *Victorson v Dep't of Treasury*, 439 Mich 131, 143-144; 482 NW2d 685 (1992). Indeed, even the majority recognizes that a statute's purpose is a relevant consideration in determining the legislative intent. See *ante* at 20 n 58.

The CRA recognizes that "freedom from discrimination because of sex is a civil right." *Chambers v Trettco, Inc*, 463 Mich 297, 309; 614 NW2d 910 (2000). Thus, the CRA is intended to "remedy[] discrimination in employment, . . . public accommodations, services, and educational institutions." *Eide*, 431 Mich at 31; see, also, *Miller v C A Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984) ("The Michigan civil rights act is aimed at the prejudices and biases borne against persons because of their membership in a certain class . . . and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases.") (quotation marks and citations omitted).[4] Furthermore, as the majority acknowledges, the CRA is a remedial statute, and "remedial statutes are to be liberally construed . . . ." *Eide*, 431 Mich at 34.

---

(emphasis added). Indeed, the members of the majority in this case recently found the purpose of the Michigan Campaign Finance Act worthy of lengthy consideration in *Mich Ed Ass'n v Secretary of State* (*On Rehearing*), 489 Mich 194; ___ NW2d ___ (2011).

[4] The majority's suggestion that the language of the CRA does not support this interpretation of the act's purpose is remarkable, given than this Court's opinions in *Eide*, *Miller*, and many other cases have similarly summarized the CRA's purpose. See, e.g., *Radtke v Everett*, 442 Mich 368, 379; 501 NW2d 155 (1993) (quoting the CRA and concluding that "[t]he Civil Rights Act is aimed at the prejudices and biases borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases") (quotation marks and citations omitted); see, also, MCL 37.2102, MCL 37.2202, and MCL 37.2302.

4

In light of this understanding of the CRA's purpose and the Legislature's intent in enacting the CRA, I believe that *Champion* properly advanced the legislative intent by ensuring that clearly discriminatory conduct is eradicated. The majority's interpretation, however, bars plaintiff from pursuing a claim in furtherance of this goal and ignores "the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination." *Champion*, 450 Mich at 714. The majority erroneously discards *Champion*'s interpretation of the legislative intent as based "purely on policy considerations," *ante* at 22, and ignores the fact that the policy considerations discussed in *Champion* were the motivation behind the Legislature's enactment of the CRA.[5] As a result, "in seeking to shield employers from liability, the majority instead places the burden of preventing an abuse of authority and the corresponding harm on

---

[5] Ironically, the majority in this case also relies on policy considerations, claiming that *Champion* creates an unfair "societal burden" and an unbearable financial burden on employers. *Ante* at 11, 26-27. It is odd that the majority opinion finds it appropriate to rely on these policy considerations while simultaneously rejecting *Champion* for its consideration of the policy concerns reflected in the CRA. Setting that contradiction aside, however, what is even more telling is the fact that *Champion*'s policy considerations were rooted in the legislative intent and purpose of the CRA. Indeed, the CRA's title expressly states that the CRA is intended to "prohibit discriminatory practices, policies, and customs . . . ." Title of 1976 PA 453. The majority opinion in this case does exactly the opposite in furtherance of policy considerations that do not appear in the CRA. Nowhere did the Legislature indicate that the "societal burden" or the financial burden on employers is a valid consideration when interpreting and applying the act. In fact, the CRA indicates that the Legislature intended that governmental employers bear the cost of eliminating sexual harassment, not avoid it, as shown by the specific inclusion of state and political subdivisions and their agents as employers covered by the act. MCL 37.2103(g) and (h) and MCL 37.2201(a); see, also, *Mack v Detroit*, 467 Mich 186, 195; 649 NW2d 47 (2002) (noting that there are areas in which "the Legislature has allowed specific actions against the government to stand, such as the Civil Rights Act").

people powerless to prevent it." *Zsigo v Hurley Med Ctr*, 475 Mich 215, 236; 716 NW2d 220 (2006) (MARILYN KELLY, J., dissenting).

Moreover, the majority's reliance on *Chambers* to support its conclusion that *Champion* was wrongly decided is misplaced. In fact, *Chambers* expressly acknowledged *Champion*'s holding as a valid part of Michigan's common law related to quid pro quo sexual harassment under the CRA. See *Chambers*, 463 Mich at 311 ("Vicarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment. *Champion*, *supra*.").

Similarly, the majority erroneously interprets *Zsigo* as supporting its conclusion that *Champion* misinterpreted the CRA. The *Zsigo* majority expressly recognized that the *Champion* Court, like many other courts, applied an exception to quid pro quo sexual harassment claims that is very similar to the aided-by-agency exception. *Zsigo*, 475 Mich at 227 n 28 (listing state and federal opinions adopting the aided-by-agency exception in sexual harassment cases). While I continue to adhere to the *Zsigo* dissent's conclusion that a narrowly tailored interpretation of the aided-by-agency exception should be applied outside the context of sexual harassment cases, that disagreement with *Zsigo* is of no moment in this case, given that the case before us is obviously a quid pro quo sexual

harassment claim. Thus, under *Chambers* and even under the majority opinion in *Zsigo*, *Champion*'s exception applies to this case.[6]

Finally, contrary to the majority's concern that *Champion* created an exception that swallows the general agency rules, *Champion*'s exception "does not extend unlimited liability to employers whose supervisors rape subordinates." *Champion*, 450 Mich at 713. A mere supervisor-subordinate relationship is not enough. Rather, an employer is only liable when "the supervisor accomplishes the rape *through the exercise of his supervisory power over the victim.*" *Id.* at 713-714 (emphasis added). As *Champion* explained, this approach is "fully consistent . . . with the legislative intent that employers,

---

[6] Although the majority is correct that *Zsigo* held that the aided-by-agency exception is not a part of Michigan's *general* common law, the majority's efforts to counter this dissent's interpretation of *Chambers* and *Zsigo* are unavailing because both of those opinions recognized that *Champion*'s exception applied *in the context of quid pro quo sexual harassment cases*, as the majority acknowledges. See *ante* at 18; see, also, *Chambers*, 463 Mich at 311 (citing *Champion* for the premise that "[v]icarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment"), and *Zsigo*, 475 Mich at 224 n 19 (recognizing that *Champion* applies "in the context of quid pro quo sexual harassment under MCL 37.2103(i)"). Indeed, the fact that the majority finds it necessary to expressly overrule *Champion* today further demonstrates that *Chambers* and *Zsigo* did not dispatch the exception created in *Champion*. The majority's refusal to accept the fact that *Champion* has been part of Michigan's common law for the last 15 years does not make its view so. Rather, as this dissent thoroughly explains, *Champion* is a longstanding, unanimous precedent of this Court that is consistent with the purpose and legislative intent behind the CRA and with the approach taken by the United States Supreme Court and many other jurisdictions in similar civil rights cases. Accordingly, the majority is mistaken when it claims that I seek to "aggressively expand the law of this state" while it merely seeks to "reaffirm[] . . . common-law rules that have always governed in Michigan." *Ante* at 30. Rather, as demonstrated by its need to overrule a deep-rooted opinion of this Court, it is the majority that embarks on an ill-advised major change in the law.

not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination." *Id.* at 714.

Furthermore, as the dissent in *Zsigo* aptly explained, it is entirely possible to adopt a narrowly tailored interpretation of the aided-by-agency exception in order to avoid swallowing the general agency rules. *Zsigo*, 475 Mich at 239-243 (MARILYN KELLY, J. dissenting).[7] After reviewing various other jurisdictions' efforts to balance the scope of the aided-by-agency exception, the *Zsigo* dissent concluded that an opinion from the Vermont Supreme Court represented the most compelling approach. See *Doe v Forrest*, 2004 VT 37, ¶ 21; 176 Vt 476; 853 A2d 48 (2004), citing *Burlington Indus, Inc v Ellerth*, 524 US 742; 118 S Ct 2257; 141 L Ed 2d 633 (1998), and *Faragher v Boca Raton*, 524 US 775; 118 S Ct 2275; 141 L Ed 2d 662 (1998). *Doe* explained that under *Faragher*, in order to properly apply the aided-by-agency exception, a court should consider three factors: (1) "the opportunity for contact created by the relationship," (2) "the powerlessness of the employee to resist the perpetrator and prevent the unwanted contact," and (3) "the opportunity to prevent and guard against the conduct." *Doe*, 2004

---

[7] The majority erroneously implies that I only rely on nonbinding dissenting opinions of this Court to support my conclusion that *Champion* was correctly decided. Although I think that the *Zsigo* dissent provides an example of a narrow, workable interpretation of the aided-by-agency exception, the bulk of my analysis in support of my conclusion that *Champion* was correctly decided rests on the reasoning from *Champion*'s well-established and unanimous opinion, which was not overruled by either of the majority opinions in *Chambers* and *Zsigo*. Surprisingly, the majority disparages my analysis for relying on *Champion*'s reasoning, see *ante* at 29 n 79, but I am quite certain that relying on longstanding, unanimous precedent from this state's highest court is a well-accepted method of legal analysis. Furthermore, I disagree with the majority's claim that *Champion* is the only "binding Michigan law" supporting my conclusion. *Ante* at 29 n 79. Rather, I believe that the CRA itself also supports my analysis.

8

VT 37 at ¶ 33; 176 Vt at 491. Thus, in response to the questions posed by the majority regarding when an employer will be held liable for an employee's conduct, see *ante* at 32, an employer would only be liable for quid pro quo sexual harassment arising out of an employee's conduct if the three factors were met, or, as *Champion* put it, when "the supervisor accomplishes the rape *through the exercise of his supervisory power over the victim.*" *Champion*, 450 Mich at 713-714 (emphasis added). Accordingly, *Champion* can be applied without imposing the boundless liability that the majority fears.

In summary, *Champion* properly relied on the legislative intent and the purpose behind the CRA when it adopted a widely accepted exception to the general rules of agency. And given that the Legislature has not chosen to amend the applicable CRA provisions during the 15 years since *Champion* was decided, I think that it is fair to conclude that the Legislature believes that *Champion* accurately reflected the legislative intent behind the CRA, rather than representing a dangerous departure from it, as the majority claims. See, e.g., *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (CAVANAGH, J., dissenting) (explaining the significance of the Legislature's decision not to modify a statute after this Court has interpreted it). Because it is "'the nature of the common law that every appellate decision represents the development of the common law,'" *Zsigo*, 475 Mich at 241 n 11 (MARILYN KELLY, J., dissenting) (citation omitted), *Champion* has been a valid part of Michigan's common law for the last 15 years and should be applied in this case.

9

## III.  STARE DECISIS

In light of the preceding analysis, it is clear that *Champion* furthers the Legislature's intent when it enacted the CRA.  As a result, *Champion* was correctly decided and no further stare decisis consideration is needed.  However, even accepting the majority's faulty conclusion that *Champion* was wrongly decided, I do not agree that its decision to overrule *Champion* is supported by stare decisis principles.

The United States Supreme Court has explained that the doctrine of stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."  *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991).  As a result, "a stare decisis analysis should always begin with the presumption that upholding the precedent involved is the preferred course of action." *Petersen v Magna Corp*, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.).  Thus, "overturning precedent requires more than a mere belief that a case was wrongly decided," *McCormick v Carrier*, 487 Mich 180, 211; 795 NW2d 517 (2010), and the presumption in favor of upholding precedent "should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn the precedent," *Petersen*, 484 Mich at 317 (opinion by MARILYN KELLY, C.J.).[8]

---

[8] In *Petersen*, then Chief Justice MARILYN KELLY provided a nonexhaustive list of criteria for consideration when a court engages in a stare decisis analysis, but no single criterion is determinative, and a given criterion need only be evaluated if relevant. *Petersen*, 484 Mich at 320.  The majority's implication that my stare decisis analysis is

Several of the criteria discussed in *Petersen* weigh particularly heavily in favor of upholding *Champion* rather than overruling it: (1) *Champion* provided a practical and workable rule, (2) *Champion* has not been robbed of significant application or justification because it remains a highly significant and relevant guidepost in the area of civil rights law, (3) other jurisdictions have adopted exceptions similar to the one in *Champion*, and (4) overruling *Champion* is likely to result in serious detriment prejudicial to public interests. See *Petersen*, 484 Mich at 320.[9]

Contrary to the majority's claims, *Champion* has not proved to be unworkable, and thus this criterion weighs in favor of upholding *Champion*. Again, although I disagree with the *Zsigo* majority's decision to limit *Champion* by applying it only to cases raising quid pro quo sexual harassment claims, that limitation is an example of an arguably workable bright-line rule regarding the scope of *Champion*'s exception. Therefore, the

---

invalid because I apply *Petersen* is misplaced, given that *Petersen*'s test simply expands on the test from *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000). Further *Petersen* is more respectful of precedent, and thus is more consistent with the principles of stare decisis. See *Petersen*, 484 Mich at 315-319 (opinion by MARILYN KELLY, C.J.).

[9] Although Chief Justice KELLY also recognized that reliance on the rule in question may be a valid consideration when engaging in a stare decisis analysis, the majority's extensive reliance on this factor to support its decision to overrule *Champion* is misplaced. In my view, this factor is of little importance in this case because no one plans on being sexually harassed or employing persons who commit sexual harassment. Thus, there is little reason for anyone to "conform his conduct to a certain norm" in reliance on *Champion*. *Ante* at 25 (quotation marks omitted). Rather, *Champion* provided a remedy for an unexpected and unwelcome event. Therefore, I find unpersuasive the majority's claim that *Champion* may be overruled because parties have not relied on its holding to their detriment.

11

majority's claim that *Champion* is unworkable because it results in unlimited vicarious liability "despite our attempt in *Zsigo* to limit *Champion*," *ante* at 23, is inexplicable.[10]

Indeed, the Court of Appeals opinions the majority cites in support of this claim, *ante* at 24 n 68, are either irrelevant or demonstrate *Champion*'s workability rather than its unworkability.

In *Diamond v Witherspoon*, 265 Mich App 673; 696 NW2d 770 (2005), and its companion case, the Court of Appeals rejected a city's claims of governmental immunity and permitted the plaintiffs to bring quid pro quo sexual harassment claims under the CRA based on the same city police officer's sexual conduct during traffic stops. The Court of Appeals explained that governmental immunity is not a defense to actions under the CRA but did not directly address the vicarious liability issues arising out of that case. *Id.* at 691. As a result, *Diamond* is of little import in determining *Champion*'s workability.

The other opinion the majority cites in this regard, *Salinas v Genesys Health Sys*, 263 Mich App 315; 688 NW2d 112 (2004), actually demonstrates *Champion*'s workability and exhibits the "meaningful demarcation" that the majority so desperately

---

[10] Moreover, the majority's claim that *Champion* allows plaintiffs to engage in "artful pleading," *ante* at 27 n 74, in order to "avoid governmental immunity by framing a claim under the CRA," *ante* at 24, is misplaced and, frankly, offensive. See, also, *ante* at 29 n 78. Plaintiff in this case, and presumably the plaintiffs in other sexual harassment cases, bring actions under the CRA because the sexual harassment infringed on their civil rights. By assuming that plaintiffs bring CRA claims to manipulate the judicial system, the majority throws salt in these plaintiffs' raw wounds.

seeks.[11] See *ante* at 32. In that case, the Court of Appeals applied the aided-by-agency exception and concluded that vicarious liability did not extend to the employer because the attacker's agency relationship with the defendant merely provided the attacker with the opportunity to commit the sexual assault. Thus, the agency relationship did not aid the attacker in committing the sexual assault. *Salinas,* 263 Mich App at 320-321. In my view, *Salinas* provided an example of how *Champion* did not create limitless liability, even in the context of quid pro quo sexual harassment claims.[12]

Finally, *Champion* itself explained that its holding "does not extend unlimited liability to employers . . . ." *Champion*, 450 Mich at 713. Rather, an employer is only liable if its employee "accomplishes the rape through the exercise of his supervisory power over the victim." *Id.* at 713-714. Such a limitation is eminently workable, as the Court of Appeals opinion in *Salinas* demonstrated. Additionally, as discussed earlier in this opinion, Vermont's high court has provided a clear example of a narrowly tailored approach to applying the aided-by-agency exception that would limit the scope of an

---

[11] Moreover, as discussed earlier in this dissent, the three-prong test established in *Doe*, 2004 VT 37, and favored by the *Zsigo* dissent further establishes a "meaningful demarcation" of an employer's liability for an employee's improper use of delegated supervisory authority.

[12] Contrary to the majority's claims, the distinction exemplified by *Salinas* is quite clear: if an employee is merely presented with an opportunity to commit sexual harassment by having the employer's permission to be in a certain location, the employer is not vicariously liable because the employee did not use any employer-delegated authority to aid in the creation of the opportunity to commit the sexual harassment. But if, as in *Champion* and the case at bar, the employee actively uses the powers delegated by the employer to direct the victim to a location or otherwise create circumstances that aid in the commission of sexual harassment, vicarious liability may attach.

employer's liability. *Doe*, 2004 VT 37 at ¶ 33; 176 Vt at 491; see, also, *Zsigo*, 475 Mich at 239-243 (MARILYN KELLY, J., dissenting) (arguing in favor of adopting *Doe*'s three-factor test). In sum, *Champion* has remained workable from the time it was first published until its untimely demise at the hands of the majority today. Thus, this factor weighs in favor of upholding *Champion*.

*Champion* also remains a highly significant and relevant guidepost in the area of civil rights law, which weighs in favor of upholding it. *Champion* remains relevant because it properly recognized that failing to impose liability on an employer when its employees use supervisory powers delegated by the employer to commit quid pro quo sexual harassment is a "far too narrow" construction of agency principles. *Champion*, 450 Mich at 712. As *Champion* explains, "immunizing an employer where it did not authorize the offending conduct would create an enormous loophole in the statute." *Id.* at 713. Therefore, *Champion* correctly concluded that when an employer delegates authority to an employee, the employer must accept the responsibility of remedying the harm caused by misuse of that authority, which is consistent with the "legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination." *Id.* at 714. Thus, *Champion* provides important guidance to trial courts and ensures that the legislative intent behind the CRA is implemented. Accordingly, *Champion* should be upheld.[13]

---

[13] The majority also states that because "the drafters of the Third Restatement of Agency have excluded the aided-by-agency exception included in the Second Restatement of Agency," *ante* at 16 n 42, *Champion* no longer reflects the preferred approach and I

Further supporting the conclusion that stare decisis does not support overruling *Champion* is the fact that numerous other jurisdictions have adopted the aided-by-agency exception in the context of civil rights cases. See *Petersen*, 484 Mich at 320 (opinion by MARILYN KELLY, C.J.). To begin with, as *Champion* stated, application of the aided-by-agency exception is a "nearly unanimous view" in the context of quid pro quo sexual harassment committed by supervisory personnel. *Champion*, 450 Mich at 712.[14] The majority opinion, however, claims that *Champion* and this dissent err in this determination because it is improper to consider federal caselaw.

---

"ignore" this "change[] in the law," *ante* at 29 n 79. To begin with, as the comments to the Third Restatement of Agency explain, the Third Restatement now addresses "[t]he purposes likely intended to be met by the 'aided in accomplishing' basis [for imposing vicarious liability] . . . by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents" elsewhere in the Restatement. 2 Restatement Agency, 3d, § 7.08, comment b, p 228. Thus, there has arguably been no "change[] in the law," given that the Third Restatement of Agency addresses the same concerns represented by the aided-by-agency exception from the Second Restatement of Agency. And, regardless, the Restatement has no precedential value and, thus, is not "the law." *Champion*, on the other hand, obviously has substantial precedential value as a well-established, unanimous opinion of this Court. Accordingly, any support for overruling *Champion* that the majority derives from the fact that the Third Restatement of Agency no longer expressly includes the aided-by-agency exception is unpersuasive, especially when, as noted later in this opinion, other jurisdictions continue to apply that exception.

[14] Although the majority mistakenly attributes this premise to me, see *ante* at 33, it was actually the unanimous *Champion* Court that concluded that its holding was consistent with the majority of other jurisdictions. I do, however, agree with *Champion*'s conclusion, given that, as explained in footnote 15 of this opinion, the United States Supreme Court and many states apply *Champion*-like exceptions in the context of civil rights cases.

15

Although the majority is correct that we are not bound by federal caselaw, it can be instructive, particularly when the federal and state statutes at issue are similar. See, e.g., *People v Victor*, 287 Mich 506, 548; 283 NW 666 (1939) (endorsing the use of federal caselaw in applying Michigan's Due Process Clause). Notably, the United States Supreme Court has concluded that the federal Civil Rights Act has a "broad remedial purpose[]," *Arizona Governing Comm for Tax Deferred Annuity & Deferred Compensation Plans v Norris*, 463 US 1073, 1090; 103 S Ct 3492; 77 L Ed 2d 1236 (1983), to "achieve equality . . . and remove barriers that have operated in the past to favor an identifiable group," *Griggs v Duke Power Co*, 401 US 424, 429-430; 91 S Ct 849; 28 L Ed 2d 158 (1971). Given that the legislative intent and purpose behind the CRA and the federal Civil Rights Act are strikingly similar, the United States Supreme Court's decision to adopt an exception to further that purpose in *Ellerth* and *Faragher* is persuasive authority in favor of upholding *Champion*.

Furthermore, regardless of whether "[o]nly a few jurisdictions have wholesale adopted the [aided-by-agency] exception . . . such that it applies to a typical tort claim," *ante* at 22 n 63, many of our sister states have—as this Court did in *Champion*—adopted comparable exceptions in the realm of civil rights sexual harassment cases in order to accomplish goals analogous to those in the CRA.[15] Thus, it is clear that *Champion* is not

---

[15] See, e.g., *Farmers Ins Group v Santa Clara Co*, 11 Cal 4th 992, 1016 n 14; 47 Cal Rptr 2d 478; 906 P2d 440 (1995) (acknowledging that the applicable statutes "indicate that respondeat superior and scope of employment principles are supposed to play an integral role in fixing an employer's liability for both supervisor and nonsupervisor sexual harassment" but applying the aided-by-agency exception because "it is reasonably clear

an "inexplicable exception," *ante* at 19 n 54 (quotation marks omitted), or "isolated

that the purpose underlying the comprehensive statutory scheme is to ensure that all employers maintain their worksites free from prohibited sexual harassment, regardless of the lack of foreseeability of such harassment in their particular enterprises"); *Doe*, 2004 VT 37 at ¶ 39; 176 Vt at 494 (adopting the aided-by-agency exception, in part because it creates an "incentive for vigilance" by those in best position to prevent harassing behavior); *Lehmann v Toys 'R' Us, Inc*, 132 NJ 587, 619; 626 A2d 445 (1993) (adopting the aided-by-agency-exception in sexual harassment cases to ensure "just results in the great variety of factual circumstances presented by sexual harassment cases and to accomplish the [statutory] purposes"); *Ocana v American Furniture Co*, 2004-NMSC-018, ¶ 31; 135 NM 539, 552; 91 P3d 58 (2004) (adopting the aided-by-agency theory because it "further[s] the policies that underlie tort law" by redistributing the economic burden from injured individuals and deterring objectionable conduct in the future); *College-Town, Div of Interco, Inc v Mass Comm Against Discrimination*, 400 Mass 156, 165; 508 NE2d 587 (1987) (noting that although the court was not bound by federal courts' interpretation of analogous federal statutes, vicarious liability based on a standard similar to the aided-by-agency exception was appropriate in order to remain consistent with the statute's purpose and clear legislative intent "that an employer be liable for discrimination committed by those on whom it confers authority"); *Frieler v Carlson Mktg Group, Inc*, 751 NW2d 558, 567-570 (Minn, 2008) (adopting the aided-by-agency exception for sexual harassment cases as consistent with the purposes of the Minnesota Human Rights Act); *Veco, Inc v Rosebrock*, 970 P2d 906, 914 (Alas, 1999) (adopting the aided-by-agency theory because harassment by supervisors is "facilitated, made more serious, and is less apt to be reported because supervisors are understood to be clothed with the employer's authority") (citation and quotation marks omitted); *Parker v Warren Co Utility Dist*, 2 SW3d 170, 176 (Tenn, 1999) (adopting the aided-by-agency exception for sexual harassment claims under Tennessee's human rights act for the reasons stated in *Ellerth* and *Faragher*); *American Gen Life & Accident Ins Co v Hall*, 74 SW3d 688, 692 (Ky, 2002) (acknowledging that Kentucky applies the aided-by-agency exception to sexual harassment claims under Kentucky's civil rights act consistently with *Ellerth* and *Faragher*); *Henningsen v Worldcom, Inc*, 102 Wash App 828, 843; 9 P3d 948 (2000) (applying the aided-by-agency exception in a sexual harassment case); *Wal-Mart Stores, Inc v Itz*, 21 SW3d 456, 470 (Tex App, 2000) (same); and *Edwards v Ohio Institute of Cardiac Care*, 170 Ohio App 3d 619, 627-628; 868 NE2d 721 (2007) (same).

As these opinions make obvious, *Champion* by no means represents an earth-shattering decision in the realm of civil rights law, and, contrary to the majority's claim, in no way do I "concede[] that *Champion* was unprecedented . . . ." *Ante* at 28. Rather, because *Champion* accurately reflected the legislative intent behind the CRA, I believe that *Champion* rests on the precedent of the CRA itself.

aberration," *ante* at 22, nor is it "hard to square . . . with any conventional notion of agency," *ante* at 19 n 54 (quotation marks omitted). Rather, *Champion* reflects a well-reasoned exception to the general rules of agency that many other jurisdictions have adopted in order to ensure that civil and human rights statutes are successful in achieving the goal of suppressing the evil of sexual harassment.

Finally, the fact that the majority's decision in this case is likely to result in serious detriment prejudicial to public interests weighs heavily in favor of upholding *Champion*. See *Petersen*, 484 Mich at 320 (opinion by MARILYN KELLY, C.J.). As discussed at length in this opinion, *Champion* properly recognized the significant public interest embodied in the CRA and adopted a narrow exception to traditional agency rules that accurately reflects the legislative intent to require employers to bear the costs of remedying and eradicating discrimination. By overruling *Champion*, the majority instead places that burden on the very people whom the CRA is intended to protect and who are powerless to prevent the discrimination that the CRA is intended to eliminate. The detriment to the public interest created by the majority opinion today is obvious and weighs heavily in favor of affirming *Champion*.

In summary, *Champion* (1) provides a practical and workable rule in furtherance of the purpose of the CRA, (2) has not been robbed of significant application or justification because it remains a highly significant and relevant guidepost in the area of civil rights law, (3) is consistent with the caselaw of other jurisdictions that have adopted the aided-by-agency exception, and (4) avoids a serious detriment prejudicial to public

18

interests. Therefore, in my view, the principles of stare decisis do not support the majority's decision to overrule *Champion*.

## IV. THE MAJORITY REACHES THE WRONG RESULT UNDER ANY STANDARD

The majority's application of its own standard is hopelessly flawed. The majority immunizes defendants from liability in this case by concluding that Johnson's acts were unforeseeable. *Ante* at 13. The majority supports this conclusion by claiming that, even when viewed in the light most favorable to plaintiff, Johnson's past violent conduct toward members of the public *and inmates* merely amounted to "a propensity to disobey work-related protocol . . . ."[16] *Ante* at 13. Furthermore, the majority concludes that Johnson's rape of plaintiff was "highly unpredictable," *ante* at 10, and, "in essence, unpreventable," *ante* at 11.

The majority's characterization of Johnson's conduct is extraordinarily one-sided, however. First, Johnson's conduct was clearly not "unpreventable" because defendants had a policy in place that required a female officer to be present anytime a female inmate was in the jail. Presumably, the motivation behind this policy is at least in part to prevent the type of conduct that Johnson committed in this case. Defendants violated that policy on the night in question, which allowed Johnson to use the supervisory powers delegated

---

[16] The majority attempts to downplay Johnson's prior violent conduct toward inmates by emphasizing that it was directed at a male inmate who had provoked Johnson. Although inconvenient to the majority's analysis, it is notable that defendants considered Johnson's actions "misconduct" and reprimanded him for it. Therefore, it appears that defendants did not consider Johnson's violent conduct toward an inmate as insignificant as the majority would have us believe.

19

to him by defendants to violently rape plaintiff. Thus, the rape of plaintiff was entirely preventable, had defendants merely followed their own policy. Furthermore, the fact that such a policy existed also strongly implies that defendants considered conduct like Johnson's foreseeable. Therefore, regardless of whether the rape was preventable, defendants' policy is one of several factors that create a genuine issue of material fact regarding whether Johnson's conduct was *foreseeable*, even under the majority's flawed new test.[17]

Second, as the majority concedes, Johnson's alleged threatening calls to his landlord and the physical altercation *with an inmate* reveal Johnson's tendency to react violently when provoked. One would think that working as a deputy in a jail would entail frequent provocation by inmates. Accordingly, tendencies such as those displayed by Johnson, when viewed in the light most favorable to plaintiff, present a genuine issue of material fact regarding whether his subsequent violent rape *of an inmate* was sufficiently foreseeable to hold defendants vicariously liable.

The majority strains to support the weight of its misguided holding by citing the majority opinion in *Brown v Brown*, 478 Mich 545; 739 NW2d 313 (2007).[18] In *Brown*,

---

[17] The majority bristles at my characterization of its test as "new." See *ante* at 11 n 32. However, given that the majority overrules *Champion*, which it admits would otherwise apply to this case, classifying its test as "new" is entirely accurate, in my judgment.

[18] Although I continue to adhere to my dissent in *Brown*, 478 Mich at 570-580 (CAVANAGH, J., dissenting), I will apply the majority opinion from *Brown* because, even under the *Brown* majority's excessively narrow standard of foreseeability, this case presents a genuine issue of material fact. And because I apply the rule from the majority

---

the attacker had no criminal history and had not previously committed any violent acts but had repeatedly made heinous sexual comments to the plaintiff of which the defendant-employer was aware. Subsequently, while working with the plaintiff on the night shift, the attacker violently raped the plaintiff. The *Brown* majority concluded that the defendant's knowledge of the attacker's comments alone were not sufficient to make the subsequent rape foreseeable. *Id*. at 554-555. The *Brown* majority chastised the Court of Appeals panel in that case for relying on *Hersh v Kentfield Builders, Inc*, 385 Mich 410; 189 NW2d 286 (1971), to reach the opposite conclusion because, according to the *Brown* majority, *Hersh* was distinguishable on its facts. In *Hersh*, an employee who had a prior manslaughter conviction violently attacked a client of the defendant-employer. This Court unanimously held that the defendant-employer was liable for its employee's violent attack on the client because the defendant knew of the employee's past violent act. *Id*. at 413.[19] The *Brown* majority seized on this reasoning to conclude that the defendant in *Brown* could not be liable for its employee's rape of the plaintiff because the employee had only engaged in "boorish" sexual *comments* toward the plaintiff but had no history of violent *acts. Brown*, 478 Mich at 557-562.

Although the *Brown* majority's analysis created a dangerous rule whereby "*no infirmity of character, shown by speech, [is] sufficient to allow a jury to decide whether,*

---

opinion in *Brown*, the majority's critique of the *Brown* dissent, *ante* at 11 n 32, is entirely irrelevant.

[19] Justice BLACK concurred in the result. See *id*. at 416.

21

in light of the employee's conduct, the employer had a duty to act," *id.* at 576

(CAVANAGH, J., dissenting), Johnson's conduct in this case, when viewed in the light

most favorable to plaintiff, was sufficient to raise a genuine issue of material fact even

under the rule in *Brown*. Johnson did not merely engage in sexual comments toward

plaintiff; rather, he had a specific history of violent and abusive behavior toward

inmates.[20] Therefore, because the unanimous *Hersh* Court and the majority in *Brown*

---

[20] The majority claims that the "dissimilar" nature and the "temporal distance" between Johnson's past violent conduct and the rape at issue immunizes defendants from foreseeability as a matter of law. First, these arguments abandon the reasoning from *Hersh* because, in that case, the attacker's conviction for manslaughter occurred 10 years before the attack in question, and the defendant in *Hersh* "was not aware of [the attacker's] specific convictions . . . ." *Hersh v Kentfield Builders, Inc*, 19 Mich App 43, 45 n 1; 172 NW2d 56 (1969). Thus, contrary to the majority's analysis today, the caselaw *does not* hold that an employee's conduct is only foreseeable to an employer if the employee had recently committed the precise conduct at issue.

Second, these arguments also demonstrate that the majority's new test for quid pro quo sexual harassment cases creates a moving target that is impossible for plaintiffs to hit. In *Brown*, the majority claimed that the attacker's aggressive sexual comments were not sufficient to make it foreseeable that the attacker would later rape the target of those comments. In this case, even though Johnson had committed a violent act against an inmate in the past, the majority claims that this conduct occurred too long ago and was too dissimilar to the conduct at issue. The majority makes no effort to explain why the acceptable 10-year gap in *Hersh* is substantially different from the 13-year gap in this case and only summarily argues that Johnson's prior violent act against an inmate was too dissimilar to his violent rape of plaintiff while she was an inmate. *Ante* at 14 n 36. Viewed in the light most favorable to plaintiff, I fail to see a difference between a violent physical altercation with an inmate and a subsequent violent rape of an inmate that is sufficient to justify deciding this case as a matter of law. Rather, given the substantial similarities between the facts of this case and the facts in *Hersh*, I believe that this Court's unanimous conclusion in *Hersh* that "[w]hether the employer knew or should have known of [the employee's] vicious propensities should not be determined by any court as a matter of law, but by the jury" is equally applicable to this case, even under the majority's flawed new test. *Hersh*, 385 Mich at 415. But under the majority position, this is apparently not so, given that the majority seemingly believes that an employee's

22

concluded that an employee's prior violent criminal acts are generally sufficient to put a defendant on notice of the employee's propensity to commit similar violent acts,[21] defendants' knowledge of Johnson's prior violent acts is sufficient to at least raise a genuine issue of material fact regarding the foreseeability of his eventual rape of plaintiff.[22] Accordingly, even under the majority's newly adopted standard for quid pro

---

act of committing a rape is only foreseeable if the employer knows that the employee actually raped someone in the recent past. The unworkability of such a requirement is obvious.

[21] Specifically, *Hersh*, 385 Mich at 413, stated that "'[t]he employer's knowledge of past acts of impropriety, violence, or disorder on the part of the employee is *generally considered sufficient to forewarn the employer*,'" quoting 34 ALR2d 390, § 9 (emphasis added), and the majority in *Brown*, 478 Mich at 560, quoted this passage from *Hersh*.

[22] Although the majority opinion cites *Brown*, 478 Mich at 555, for the proposition that "[e]ven the incident of aggression [toward an inmate] did not put defendants on reasonable notice that Johnson would sexually assault an inmate [because] violent actions do not inevitably lead to acts of criminal sexual conduct," *ante* at 13, the cited portion of *Brown* does not actually support that conclusion. Rather, the relevant portion of *Brown* states that "[c]omments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry *comment* inexorably results in a violent criminal assault." *Brown*, 478 Mich at 555 (emphasis added). Furthermore, *Brown* later stated, while discussing *Hersh*, that "it is the employee's *known past acts* that provide a basis for the employer's knowledge of the employee's 'impropriety, violence, or disorder' and that those acts potentially place an employer on notice of the employee's violent propensities." *Id.* at 561. Therefore, it appears that the majority has even further limited the scope of previous conduct by an employee that will be sufficient to put an employer on notice of the employee's violent propensities. Disregarding the fact that a rape is an "incident of aggression," the majority claims that Johnson's previous "incident of aggression" toward an inmate did not make his subsequent rape of plaintiff foreseeable because the previous "incident of aggression" was not a "sexual assault." The majority's efforts to distinguish the differences between various violent acts leaves plaintiffs vulnerable to harm and immunizes employers from liability unless an employee commits the exact same act that he or she previously committed. In my view, the majority's analysis is arbitrary and undercuts the clear legislative intent of the CRA.

quo sexual harassment claims under the CRA, the majority reaches the wrong result in this case.

Finally, by overruling *Champion*, the majority has caused a major shift in Michigan's quid pro quo sexual harassment jurisprudence. Thus, even if I agreed with the majority's new standard, I could not support its hasty decision to reverse the judgment of the Court of Appeals. As the majority readily admits, *Champion* clearly applies to this case, and plaintiff's arguments appropriately focused on the principles set forth in *Champion* rather than the majority's newly imposed foreseeability analysis.[23] As

---

[23] Curiously, the majority proclaims that "[n]o meaningful distinction can be drawn between the facts in *Champion* and those in the present matter," *ante* at 23, but later finds fault in my conclusion that a straightforward application of *Champion* is appropriate in this case. My conclusion is not faulty; rather, it simply reflects an adherence to the doctrine of stare decisis. It is the majority that falters in its effort to satisfy the burden of explaining its imprudent decision to forgo precedent.

Indeed, the majority's argument that the "conflicting dispositions in the courts below" support its decision to overrule *Champion*, *ante* at 31, is simply one more example of the majority's misplaced efforts to satisfy its burden. While it is true that the trial court in this case applied *Zsigo* and the Court of Appeals applied *Champion*, a simple answer exists for this apparent conflict. Although our trial courts work diligently and, in the vast majority of instances, reach the correct result, the trial courts do, on occasion, err. Indeed, the Court of Appeals and this Court exist in large part to address this reality.

In this case, the trial court erred by applying *Zsigo* because *Zsigo* did not consider a quid pro quo sexual harassment claim. Rather, as the Court of Appeals correctly determined, the proper course of conduct in this quid pro quo sexual harassment case was to apply *Champion*, not *Zsigo*. Indeed, as repeatedly noted in this dissent, the *Zsigo* majority recognized that *Champion* applies "in the context of quid pro quo sexual harassment under MCL 37.2103(i)." *Zsigo*, 475 Mich at 224 n 19. Therefore, the resolution of this case should be simple: *Champion* should apply because this is a quid pro quo sexual harassment case. It is the majority that needlessly injects "conflicting precedents and principles." *Ante* at 31.

24

a result, the Court of Appeals did not consider the merits of plaintiff's claims under the foreseeability standard that the majority now adopts. Accordingly, the majority should not reach the merits of this case because this unexpected shift away from *Champion* prevented plaintiff from making arguments related to the standard that the majority now applies. Rather, given its holding, the majority should remand this case to the lower courts for further proceedings so that plaintiff may develop arguments related to the majority's newly applicable, yet erroneous, standard for quid pro quo sexual harassment claims.

## V. CONCLUSION

I disagree with the majority's decision to overrule *Champion* because that case was correctly decided and furthers the legislative intent and purpose of the CRA. Moreover, the doctrine of stare decisis weighs against overruling *Champion*. Furthermore, the majority misapplies its newly created standard in this case and usurps the role of the jury when it concludes that defendants are entitled to a favorable decision as a matter of law. Accordingly, I dissent.

Michael F. Cavanagh
Marilyn Kelly

25

STATE OF MICHIGAN

SUPREME COURT

TARA KATHERINE HAMED,

      Plaintiff-Appellee,

v

No. 139505

WAYNE COUNTY and WAYNE
COUNTY SHERIFF'S DEPARTMENT,

      Defendants-Appellants,
and

SERGEANT KENNETH DARWISH,
CORPORAL NETTIE JACKSON,
SHERIFF WARREN C. EVANS, and
DEPUTY REGINALD JOHNSON,

      Defendants.

_____

HATHAWAY, J. (*dissenting*).

I dissent from the majority's decision to overrule *Champion v Nation Wide Security, Inc*, 450 Mich 702; 545 NW2d 596 (1996). I fully agree with and join parts I, II, IV, and V of Justice CAVANAGH's dissenting opinion. It is my strong belief that *Champion*, a unanimous decision of this Court,[1] was not only correctly decided, but served to protect the rights of victims of discrimination. Because the majority overrules correctly decided precedent, no stare decisis analysis is necessary. The majority's

---

[1] The concurring justices joined the analysis in full. See *Champion*, 450 Mich at 714 (BOYLE, J., concurring).

analysis and conclusions are fundamentally flawed, and today's decision significantly undermines the "legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination." *Champion*, 450 Mich at 714. Finally, for the reasons given in Justice CAVANAGH's thoughtful and well-reasoned dissenting opinion, the majority's decision is contrary to the rule of law and results in the dismantling of the Michigan Civil Rights Act, MCL 37.2101 *et seq.* Accordingly, I dissent.

Diane M. Hathaway